## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Federal Insurance Company, RSUI Indemnity Company, and North River Insurance Company, <br><br> Plaintiffs, <br><br> v. <br><br><br> Pfizer, Inc., <br><br> Defendant. | <br><br><br><br><br><br> Case No. <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Federal Insurance Company, RSUI Indemnity Company, and North River Insurance Company (collectively, the "Insurers") bring this action for declaratory judgment and breach of contract against defendant Pfizer, Inc. ("Pfizer"). The Insurers issued excess executive and organization liability insurance policies to Pfizer (the "Policies"). Pfizer has sought coverage under the Policies for its $400 million settlement of the securities class action *Jones v. Pfizer, Inc., et al.*, No. 1:10cv3864-AKH (S.D.N.Y.) (the "Jones Action"). Over the past three years, the Insurers have sought information from Pfizer to assist them in evaluating coverage for the Jones Action, but Pfizer has not provided the requested information. The Insurers now seek a declaration that their Policies do not afford coverage for the settlement of the Jones Action and seek damages for Pfizer's breach of its cooperation obligations under the Policies. In support of their Complaint, the Insurers allege as follows.

## JURISDICTION AND VENUE

1.      This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, for the purposes of determining a question of actual controversy between the parties, as well as for breach of contract.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because each of the plaintiff Insurers and defendant Pfizer are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Pfizer has its principal place of business in this district.

## PARTIES

4.      Federal Insurance Company ("Federal") is an Indiana corporation with a principal place of business in New Jersey.

5.      RSUI Indemnity Company ("RSUI") is a New Hampshire corporation with its principal place in Georgia.

6.      North River Insurance Company ("North River") is a New Jersey corporation with its principal place of business in New Jersey.

7.      Pfizer is a Delaware corporation with its principal place of business in New York.

## BACKGROUND

**The Policies**

8.      The Insurers issued executive and organization liability insurance policies to Pfizer for the policy period April 16, 2008 to April 16, 2009.  The insurance "tower" for 2008-2009 includes a primary policy and thirteen excess layers totaling $225 million.

9.      Illinois National Insurance Company issued the $25 million primary policy to Pfizer (the "Primary Policy").  A copy of the Primary Policy is attached as Exhibit A.  Upon information and belief, Illinois National has paid the limit of its policy and/or reached a settlement with Pfizer.  Illinois National is not a party to this action.

10.     Twin City Fire Insurance Company issued a $15 million first excess policy that attaches after exhaustion of $25 million in underlying limits.  Upon information and belief, Twin City has paid the limit of its policy and/or reached a settlement with Pfizer.  Twin City is not a party to this action.

11.     Zurich American Insurance Company issued a $15 million second excess policy that attaches after exhaustion of $40 million in underlying limits.  Upon information and belief, Zurich has paid the limit of its policy and/or reached a settlement with Pfizer.  Zurich is not a party to this action.

12.     US Specialty Insurance Company issued a $15 million third excess policy that attaches after exhaustion of $55 million in underlying limits.  Upon information and belief, US Specialty has paid the limit of its policy and/or reached a settlement with Pfizer.  US Specialty is not a party to this action.

13.     Federal issued a $5 million policy (the "Federal Policy").  Together with a $5 million policy issued by State National Insurance Company, the Federal Policy comprises a $10 million fourth excess layer of insurance that attaches after exhaustion of $70 million in underlying insurance.  A copy of the Federal Policy is attached as Exhibit B.  State National is not a party to this action.

14.     AIG Excess Liability Insurance International Limited issued a $20 million fifth excess policy that attaches after exhaustion of $80 million in underlying insurance.  Upon

information and belief, AIG has reached a settlement with Pfizer.  AIG is not a party to this lawsuit.

15.     ACE Bermuda Insurance Company issued a $15 million sixth excess policy that attaches after exhaustion of $100 million in underlying insurance.  Upon information and belief, ACE has reached a settlement with Pfizer.  ACE is not a party to this lawsuit.

16.     Darwin National Assurance Company issued a $10 million seventh excess policy that attaches after exhaustion of $115 million in underlying insurance.  Upon information and belief, Darwin has reached a settlement Pfizer.  Darwin is not a party to this action.

17.     Liberty Mutual Insurance Company issued a $15 million eighth excess policy that attaches after exhaustion of $130 million in underlying insurance.  Liberty Mutual is not a party to this action.

18.     Allied World Assurance Company Limited issued a $10 million ninth excess policy that attaches after exhaustion of $140 million in underlying insurance.  Upon information and belief, Allied World has reached a settlement with Pfizer.  Allied World is not a party to this action.

19.     AXIS Insurance Company issued a $10 million tenth excess policy that attaches after exhaustion of $150 million in underlying insurance.  AXIS is not a party to this action.

20.     AIG Excess Liability Insurance International Limited issued a $15 million eleventh excess policy that attaches after exhaustion of $160 million in underlying insurance.  Upon information and belief, AIG has reached a settlement with Pfizer.  AIG is not a party to this lawsuit.

21.     North River issued a $10 million excess policy (the "North River Policy") and RSUI issued a $15 million excess policy (the "RSUI Policy") that together comprise a $25

million twelfth excess layer that attaches after exhaustion of $175 million in underlying

insurance.  A copy of the North River Policy is attached as Exhibit C.  A copy of the RSUI

Policy is attached as Exhibit D.

22.     Endurance Specialty Insurance Limited issued a $25 million thirteenth excess

policy that attaches after exhaustion of $200 million in underlying insurance.  The Endurance

Policy has an arbitration provision.  Endurance is not a party to this lawsuit.

23.     The Policies are "claims made" policies.  Subject to their terms and conditions,

the Policies afford specified coverage for "Claims first made against an Insured during the Policy

Period . . . ."  Primary Policy, Section 1.

24.     The Policies provide that

> If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a)
> above, then a Claim which is subsequently made against an Insured and reported
> to the Insurer alleging, arising out of, based upon or attributable to the facts
> alleged in the Claim for which such notice has been given, or alleging any
> Wrongful Act which is the same as or related to any Wrongful Act alleged in the
> Claim of which such notice has been given, shall be considered related to the first
> Claim and made at the time such notice was given.

Primary Policy, Section 7(b).

25.     The Policies contain the following exclusion:

> The Insurer shall not be liable to make any payment for Loss in connection with
> any Claim made against an Insured: . . .
>
> alleging, arising out of, based upon or attributable to the facts alleged, or to the
> same or related Wrongful Acts alleged or contained in any Claim which has been
> reported, or in any circumstances of which notice has been given, under any
> directors and officers liability policy, employment practices liability policy or
> employee benefit plan fiduciary liability policy of which this policy is a renewal
> or replacement or which it may succeed in time.

Primary Policy, Section 4(d), as amended by End. 29 (the "Prior Notice Exclusion").

26.     The Policies also contain the following exclusion:

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with:  (i) any Claim(s), notices, events, investigations or actions referred to in any of Items (1) through (16) below; (hereinafter "Events"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any Event(s); or (b) any Claim(s) arising from any Event(s); or (iii) any Breach of Fiduciary Duty, Wrongful Act, underlying facts, circumstances, acts or omissions related, directly or indirectly, to any Event(s): . . .

(3)     Philip Morabito v. Pfizer, Inc., et al., No. 04-CV-09967, filed in the United States District Court for the Southern District of New York . . . .

It is further understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim(s) alleging, arising out of, based upon , attributable to or related directly or indirectly to a related Breach of Fiduciary Duty or related Wrongful Act alleged in any of the Items (1) through (16) above, regardless of whether or not such Claim(s) involved the same or different Insureds, the same or different legal causes of action, or the same or different claimants, or is brought in the same or different venue, or resolved in the same or different forum.

Primary Policy, End. 7 (the "Morabito Specific Litigation Exclusion").

27.     The Policies also contain the following exclusion:

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with: [ ] any Claim(s), notices, events, investigations or actions referred to in any of item (1) below (hereinafter "Events")……[or] any Breach of Fiduciary Duty, Wrongful Act, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to any Event(s):

(1)     Robert L. Garber v. Pharmacia (hereinafter the "Events")

It is further understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim(s) alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to a related Breach of Fiduciary Duty or related Wrongful Act alleged in any of the item (1) above, regardless of whether or not such Claim involved the same or different Insureds, the same or different legal causes of action, or the same or different claimants, or is brought in the same or different venue, or resolved in the same or different forum.

Primary Policy, End. 6 (the "Garber Specific Litigation Exclusion").

28.     In addition, the North River Policy contains the following exclusion:

Notwithstanding anything to the contrary in the Underlying Insurance, the coverage afforded herein shall not apply to any Claim made against any Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

1.      any litigation, case, proceeding, demand letter, governmental investigation, or inquiry, or any investigation or inquiry into or against any Insured which commenced prior to or is pending at the applicable date shown in Item 5 of the Declarations [6/28/04];

2.      any extension or amendment of such pending or prior litigation, case or proceeding; or

3.      any facts, circumstances, situations, transactions, or events, which in whole or in part, are the subject of, are related to, or which have as a common nexus any such fact, circumstance, situation, transaction, or event underlying such pending or prior litigation, case or proceeding.

North River Policy (the "North River Prior and Pending Exclusion").

29.     The RSUI Policy contains the following exclusion:

[RSUI] shall not be liable to make any payment for loss in connection with any claim made against any Insured alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any Insured that was commenced or initiated prior to, or pending as of 6/28/2004 or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

RSUI Policy (the "RSUI Prior and Pending Exclusion").

30.     The Policies are excess policies that attach only after all underlying insurance has been exhausted.

31.     The North River Policy provides as follows:

The Excess Insurer shall provide the Insured(s) coverage for Claims first made during the Policy Period and during the Extended Reporting Period, if exercised, (1) only in excess of all Underlying Insurance, (2) only after all Underlying Insurance has been exhausted by payment of the underlying Limit of Liability by each Underlying Insurer for the Limit of Liability shown in the Schedule of Underlying Insurance in Item 7 of the Declarations, and (3) only if such total Limit of Liability is exhausted as a result of Loss resulting from Claims. . . .

32. The Policies provide that Pfizer "shall give the Insurer full cooperation and such information as it may reasonably require." Primary Policy, Section 8.

**The Prior Matters**

**The Garber Action.**

33. On or about April 7, 2003, shareholders of Pharmacia Corporation brought a securities class action against the company and its officers. *See Garber v. Pharmacia Corp.*, No. 03cv1519 (D.N.J.) (the "Garber Action").

34. On or about October 27, 2003, a consolidated amended complaint (the "Garber CAC") was filed adding Pfizer, which had acquired Pharmacia shortly after the initial complaint in the Garber Action was filed.

35. The Garber CAC generally alleged that Pharmacia falsely marketed the drug Celebrex as effectively treating arthritis-based inflammation without the gastrointestinal problems associated with long-term use of ibuprofen and aspirin.

36. Among other things, the Garber plaintiffs alleged that Pharmacia commissioned and funded the "Celecoxib Long-Term Arthritis Safety Study" (the "CLASS study"). According to the Garber plaintiffs, Pharmacia represented that the CLASS study found that patients who took Celebrex had fewer gastrointestinal problems than patients who took ibuprofen. The Garber plaintiffs alleged that Pharmacia "manipulat[ed] the data, protocol, and criteria" in the CLASS Study to falsely support the claim that Celebrex was superior to ibuprofen and comparable traditional drugs.

37. Pfizer settled the Garber Action in 2013 by paying $164 million.

**The Morabito Action.**

38.     On or about December 15, 2004, a securities class action lawsuit was filed against Pfizer.  *See Showers v. Pfizer, Inc.* No. 04-9866 (S.D.N.Y.).  A second securities class action lawsuit was filed on or about December 17, 2004.  *See Morabito v. Pfizer, Inc.*, No. 04-9967 (S.D.N.Y.).  The suits subsequently were consolidated under the caption *In re Pfizer, Inc. Securities Litigation* (the "Morabito Action")*.*  A first amended consolidated complaint was filed on March 27, 2012 (the "Morabito FAC").

39.     The Morabito plaintiffs alleged that defendants made material misrepresentations about the safety and marketability of the drugs Celebrex and Bextra that artificially inflated Pfizer's stock price.

40.     The Morabito plaintiffs alleged that Pfizer marketed Celebrex and Bextra as "safe" drugs effective in a variety of applications.  According to plaintiffs, however, Pfizer concealed and misrepresented the serious risks that Celebrex and Bextra posed to cardiovascular health.  The Morabito plaintiffs alleged that if the risks had been properly disclosed, the drugs would at most have had narrow niche uses or would not have been approved at all.

41.     According to the Morabito FAC, after Pfizer's competitor Merck withdrew a comparable drug, Vioxx, because of cardiovascular risks, Pfizer began to disclose the similar risks associated with Celebrex and Bextra.  The Morabito plaintiffs alleged that Pfizer withdrew Bextra from the market in April 2005.

42.     The Morabito plaintiffs alleged that, in 2004, after Merck withdrew Vioxx from the market, the DOJ began investigating Pfizer's marketing of Celebrex and Bextra.  Those plaintiffs further alleged that the DOJ investigation culminated in a 2009 guilty plea by Pfizer

subsidiary Pharmacia & Upjohn Company and a 2009 deferred prosecution agreement between Pfizer and the DOJ.

43.     Pfizer settled the Morabito Action in 2016 by paying $486 million.

**The Qui Tam Actions, the U.S. Attorney's Investigation, and the Criminal Action.**

44.     Beginning in 2003, several False Claims Act suits were filed against Pfizer (the "Qui Tam Actions").  The Qui Tam Actions included the following lawsuits:  *United States ex rel. Kopchinski v. Pfizer, Inc.*, No. 03-60494 (S.D. Fla.) (the "Kopchinski Action"); *United States ex rel. Collins v. Pfizer, Inc.*, No. 04-11780 (D. Mass.); *United States ex rel. Spencer v. Pfizer, Inc.*, No. 05-12326 (D. Mass.); *United States ex rel. DeMott v. Pfizer, Inc.*, No. 05-12040 (D. Mass.); *United States ex rel. Farber v. Pfizer, Inc.*, No. 07-10304 (D. Mass.); *United States ex rel. Rainero v. Pfizer*, No. 07-11728 (D. Mass.); *United States ex rel. Westlock v. Pfizer*, No. 08-11318 (D. Mass.); *United States ex rel. Liter v. Pfizer, Inc.*, No. 06-176 (E.D. Ky); and *United States ex rel. Kruszewski v. Pfizer, Inc.*, No. 07-4106 (E.D. Pa.).

45.     In general, the Qui Tam Actions alleged that Pfizer engaged in off-label marketing of the drugs Bextra, Geodon, Lyrica, and Zyvox, marketing the drugs for uses for which they had not been approved by the United States Food and Drug Administration ("FDA").

46.     In February 2004, the United States Attorney for the District of Massachusetts informed Pfizer that it was investigating Pfizer's marketing of Bextra, including for off-label usage (the "U.S. Attorney's Investigation").

47.     In December 2004, the government issued a subpoena to Pfizer regarding its marketing of Bextra.

48.     In July 2007, the government issued a subpoena to Pfizer regarding its marketing of Lyrica.

49.     In December 2007, the government issued a subpoena to Pfizer regarding its marketing of Geodon and Zyvox.

50.     In early 2008, Pfizer offered to pay the government between $50 million to $70 million to settle any civil liability relating to the marketing of Bextra.

51.     In March 2008, Pfizer offered $250 million to settle the U.S. Attorney's Investigation.

52.     On April 4, 2008, the U.S. Attorney's Office made a settlement demand of $5 billion.

53.     The Qui Tam Actions were resolved when Pfizer entered into a settlement with the Department of Justice in August 2009.  Among other things, Pfizer agreed to pay $1 billion to the United States and certain participating states.

54.     The settled claims include the following conduct:

(a)     Pfizer "illegally promoted the sale and use of Bextra for a variety of conditions (including acute pain and various types of surgical pain) and at dosages other than those for which its use was approved by the [FDA]"; "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Bextra"; and "made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Bextra."

(b)     Pfizer "illegally promoted the sale and use of Geodon for a variety of off-label conditions (including depression, bipolar maintenance, mood disorder, anxiety, aggression, dementia, attention deficit hyperactivity disorder, obsessive compulsive disorder, autism and post-traumatic stress disorder) and for patients (including pediatric and adolescent patients) and dosages that were off-label"; "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Geodon"; and "made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Geodon."

(c)     Pfizer "illegally promoted the sale and use of Zyvox for a variety of off-label conditions (including infections caused by methicillin-resistant Staphylococcus aureus ("MRSA") generally, rather than only those types of MRSA infections for which Zyvox was FDA-approved)"; "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Zyvox"; and

"made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Zyvox."

(d)     Pfizer "illegally promoted the sale and use of Lyrica for a variety of off-label conditions (including chronic pain, neuropathic pain, perioperative pain, and migraine)"; "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Lyrica"; and "made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Lyrica."

55.     At the same time that Pfizer settled the Qui Tam Actions, in 2009, its subsidiary Pharmacia agreed to plead guilty to one count of introducing a misbranded drug, Bextra, into interstate commerce.  *See U.S. v. Pharmacia & Upjohn Co., Inc.* No. 09-10258 (D. Mass.) (the "Criminal Action").  Pharmacia also agreed that it acted knowingly, intentionally and willfully.

56.     Among other things, Pharmacia admitted that it marketed Bextra to treat general acute pain, including surgical pain, despite the FDA's refusal to approve Bextra for such uses; marketed Bextra for prevention of deep vein thrombosis although it was not approved for such use; and told physicians that Bextra was safer than competitor drug Vioxx without any basis for the comparison.

57.     As part of its plea, Pharmacia agreed to pay a criminal fine of $1.195 billion and criminal forfeiture of $105 million.

**The Jones Action.**

58.     On or about May 11, 2010, a securities class action lawsuit was filed against Pfizer and its directors and officers.  *See Jones v. Pfizer, Inc.*, No. 10-3864 (S.D.N.Y.) (the "Jones Action").  A first amended consolidated complaint was filed on or about April 15, 2011 (the "Jones FAC").

59.     The Jones plaintiffs alleged that defendants made false and misleading statements about Pfizer's unlawful off-label marketing of the drugs Bextra, Geodon, Lyrica, and Zyvox that

artificially inflated the price of Pfizer stock.  The Jones plaintiffs further alleged that the truth

about Pfizer's off-label marketing emerged when the company announced that it would pay $2.3

billion in connection with the Criminal Action and settlement of the Qui Tam Actions.

60.     The Jones FAC makes allegations about the off-label marketing of Bextra,

Geodon, Lyrica and Zyvox similar to those in the Qui Tam Actions.  Indeed, the plaintiffs in the

Jones Action reference the Qui Tam Actions as support for the allegations in the Jones FAC.

Jones FAC ¶ 18 n.4.

61.     The Jones plaintiffs alleged that the defendants' failure to disclose that Pfizer was

illegally promoting Bextra, Geodon, Zyvox, and Lyrica for unapproved off-label uses constitute

material misrepresentations and omissions because a substantial amount of the company's profits

were dependent on illegal conduct; the company was at risk of being banned from federal and

state funded healthcare programs as a result of illegal off-label marketing; and the company had

inadequate internal controls to detect and prevent off-label marketing.  FAC ¶ 15.

62.     The Jones plaintiffs further alleged that defendants failed adequately to disclose

that Pfizer was facing "massive criminal and civil investigations" and that Pfizer "faced

materially adverse financial consequences that required contingency reserves."  *Id*.

63.     According to the Jones plaintiffs, "[o]n 1/26/09, Pfizer stunned investors by

announcing that the Company had agreed to pay $2.3 billion to resolve criminal and civil

investigations stemming from its continued unlawful off-label marketing of Bextra and three

other drugs. . . . The price of Pfizer common stock declined from $17.45 to $15.65 on 1/26/09 as

the artificial inflation caused by defendants' misrepresentations and omissions came out of the

stock price, resulting in massive losses to Pfizer's investors and a single day loss in Pfizer's

market capitalization of more than $12 billion."  *Id*. ¶ 19.

64.     Pfizer settled the Jones Action in 2015 for $400 million.

**The Present Coverage Dispute**

65.     On or about October 6, 2008, Pfizer shareholder James Groen sent a letter to Pfizer's Board of Directors demanding inspection of Pfizer's books and records pursuant to Section 220 of the Delaware General Corporation Law (the "Groen Demand").

66.     The Groen Demand sought various categories of documents.  Among the requested documents were certain studies concerning Celebrex and Bextra, including a "1999 Alzheimer's Study of Celebrex"; the "Coronary Artery Bypass Graft Trial" of Bextra; the "Celecoxib Long-Term Arthritis Safety Study ("CLASS Study") of Celebrex"; the FDA's "2000-2001 review of the efficacy and safety of Celebrex"; "FDA approval letters for both Celebrex and Bextra"; and documents "regarding the removal of Bextra from the market."  The Groen Demand also sought Board Materials "concerning the sales, marketing, and branding of Celebrex and Bextra" and all documents produced to the plaintiffs in the Morabito Action.

67.     On or about February 27, 2009, Pfizer shareholders Norman and Lita Weinstein sent a letter to Pfizer's Board of Directors demanding that the Board take remedial action on behalf of the company (the "Weinstein Demand").

68.     The Weinstein Demand stated that Pfizer had knowledge in 2003 or 2004 that the DOJ was investigating its marketing of Bextra and subsequently paid $2.3 billion to settle the federal investigation into its off-label marketing practices.  The Weinsteins alleged that Pfizer's Board had "abdicat[ed] its fundamental duty of oversight" and demanded that Pfizer take legal action against its officers and directors who had failed to detect or prevent the unlawful marketing practices at issue in the DOJ investigation and settlement.

69.     Pfizer tendered the Groen Demand and Weinstein Demand to the Insurers.

70.     Pfizer subsequently tendered the Jones Action to the Insurers for coverage under the Policies.  Pfizer took the position that although the Jones Action was filed after the policy period of the Policies had expired, the Jones Action constituted a Claim first made under the Policies because it was related to the Groen Demand and Weinstein Demand.

71.     All of the Insurers raised a number of coverage issues and defenses applicable to the Jones Action and reserved all of their rights and defenses.  Certain of the Insurers have denied coverage with respect to the Jones Action.

72.     Pfizer seeks coverage for the Jones Action settlement from the Insurers.  Pfizer's costs of defending the Jones Action fall within the layers of insurance underlying the Insurers.

73.     Over at least the last three years, the Insurers have requested information from Pfizer to assist them in evaluating coverage for the Jones Action.

74.     Among other things, the Insurers have requested information and materials reflecting whether Pfizer provided notice under any other tower of insurance of the Jones Action, the Qui Tam Actions, the DOJ investigation, or any other claim or notice of potential claim concerning the off-label marketing of Bextra, Geodon, Zyvox or Lyrica.  The Insurers also requested copies of any such notice correspondence.

75.     Pfizer has declined to provide the requested information.

76.     Pfizer has taken the position that such notice correspondence with insurers on other policy years is privileged and/or confidential and therefore it will not provide such correspondence.

77.     The Policies are claims-made policies that contain an express Prior Notice Exclusion.  The notice correspondence that the Insurers have requested is directly relevant to whether the Jones Action constitutes a Claim first made during the period of the Policies and

whether the Prior Notice Exclusion applies to preclude coverage for the Jones Action.  It therefore was reasonable for the Insurers to request such information and materials.

78.     The Insurers also have requested documentation to support Pfizer's claim that the insurance underlying each of the Policies has been exhausted as required by certain of the Policies.

79.     Pfizer has entered into settlement agreements with various insurers on the 2008-2009 tower who are not parties to this action.  However, Pfizer has declined to provide copies of those settlement agreements to the Insurers.  Certain of the Insurers therefore are not able to determine whether the insurance underlying their Policies actually has been exhausted.

80.     It was reasonable for the Insurers to request information and materials to determine whether the insurance underlying their respective Policies was exhausted in accordance with the terms of those Policies.

81.     The Policies require that Pfizer and the Insurers must either mediate any coverage dispute before proceeding to litigation or submit to binding arbitration.

82.     The parties engaged in mediation on October 3, 2017 but were not able to resolve their dispute.

83.     An actual controversy exists between each Insurer, on the one hand, and Pfizer, on the other hand, regarding the existence of coverage under the Policies for the Jones Action settlement.

**<u>COUNT I</u>**
**(For a Declaration That No Coverage Is Available**
**Because the Jones Action Is Not a Claim First Made During the Policy Period)**

84.     The Insurers incorporate by reference the allegations of Paragraphs 1 through 83 as if fully set forth herein.

85.     The Policies afford coverage only for Claims first made during the Policy Period.

86.     The Jones Action arises out of, is based upon, is attributable to, or alleges the same or related Wrongful Acts as Claims that were made before the Policy Period, including but not limited to the Garber Action, the Morabito Action, the Qui Tam Actions, and settlement demands made during the U.S. Attorney's Investigation.

87.     The Insurers are entitled to a declaration that no coverage is available because the Jones Action is not a Claim first made during the Policy Period.

### COUNT II
**(For a Declaration That No Coverage Is Available
Based on the Prior Notice Exclusion)**

88.     The Insurers incorporate by reference the allegations of Paragraphs 1 through 87 as if fully set forth herein.

89.     The Policies contain a Prior Notice Exclusion that states:  "The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured: alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any directors and officers liability policy, employment practices liability policy or employee benefit plan fiduciary liability policy of which this policy is a renewal or replacement or which it may succeed in time."

90.     Upon information and belief, Pfizer provided notice of the Jones Action under directors and officers liability policies of which the Policies are renewals or replacements or which the Policies succeed in time.

91.     Upon information and belief, the Jones Action arises out of, is based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given,

under any directors and officers liability policies of which the Policies are renewals or replacements or succeed in time.

92.     The Insurers are entitled to a declaration that the Prior Notice Exclusion bars coverage for the Jones Action.

## COUNT III
### (For A Declaration That No Coverage Is Available
### Based On The Morabito Specific Litigation Exclusion)

93.     The Insurers incorporate by reference the allegations of Paragraphs 1 through 92 as if fully set forth herein.

94.     The Morabito Specific Litigation Exclusion bars coverage for any Claim arising from the Morabito Action or any "Breach of Fiduciary Duty, Wrongful Act, underlying facts, circumstances, acts or omissions related, directly or indirectly" to the Morabito Action.

95.     The Jones Action arises from the Morabito Action or any Breach of Fiduciary Duty, Wrongful Act, underlying facts, circumstances, acts or omissions related, directly or indirectly, to the Morabito Action.

96.     The Insurers are entitled to a declaration that the Morabito Specific Litigation Exclusion bars coverage for the Jones Action.

## COUNT IV
### (For A Declaration That No Coverage Is Available
### Based On The Garber Specific Litigation Exclusion)

97.     The Insurers incorporate by reference the allegations of Paragraphs 1 through 96 as if fully set forth herein.

98.     The Garber Specific Litigation Exclusion bars coverage for any Claim arising from the Garber Action or any "Breach of Fiduciary Duty, Wrongful Act, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly" to the Garber Action.

99.     The Jones Action arises from the Garber Action or any Breach of Fiduciary Duty, Wrongful Act, underlying facts, circumstances, acts or omissions in any way related, directly or indirectly, to the Garber Action.

100.    The Insurers are entitled to a declaration that the Garber Specific Litigation Exclusion bars coverage for the Jones Action.

### COUNT V
**(For A Declaration That No Coverage Is Available
Based On The Prior and Pending Exclusions)**

101.    The Insurers incorporate by reference the allegations of Paragraphs 1 through 100 as if fully set forth herein.

102.    The Prior and Pending Exclusions in the North River and RSUI Policies each bar coverage for the Jones Action because the lawsuit alleges, arises out of, is based upon, and is attributable to at least one of the Qui Tam Actions, the Kopchinski Action, and, as respects the North River Policy, the U.S. Attorney's Investigation, which were commenced in 2003 and February 2004, respectively, before the operative date in the exclusions.

103.    The Prior and Pending Exclusions in the North River and RSUI Policies bar coverage for the Jones Action because the lawsuit arises out of or is based upon the facts and circumstances underlying or alleged in the Kopchinski Action, and, as respects the North River Policy, the U.S. Attorney's Investigation, which were commenced in 2003 and February 2004, respectively, before the operative date in the exclusions.

104.    North River and RSUI are entitled to a declaration that the Prior and Pending Exclusion bars coverage for the Jones Action.

<u>COUNT VI</u>
**(For A Declaration That No Coverage Is Available
Because Pfizer Has Not Exhausted the Underlying Insurance)**

105.    The Insurers incorporate by reference the allegations of Paragraphs 1 through 104 as if fully set forth herein.

106.    The insuring agreement to the North River Policy provides that coverage is available, if at all, only where the loss exceeds the limits of all underlying insurance and each underlying insurer has exhausted its limit by actual payment of covered loss.

107.    Each underlying insurer has not exhausted its limit of liability by actual payment of covered loss.

108.    North River is entitled to a declaration that no coverage is available under the North River Policy by virtue of Pfizer's failure to satisfy the insuring agreement to such policy.

<u>COUNT VII</u>
**(Breach of Cooperation Obligations)**

109.    The Insurers incorporate by reference the allegations of Paragraphs 1 through 108 as if fully set forth herein.

110.    The Policies provide that Pfizer "shall give the Insurer full cooperation and such information as it may reasonably require."  Primary Policy, Section 8.

111.    The Insurers reasonably requested information from Pfizer in order to assess whether the Jones Action constitutes a Claim first made during the policy period of the Policies and whether the Prior Notice Exclusion bars coverage.  Pfizer did not provide the information.

112.    The Insurers reasonably requested information from Pfizer in order to assess whether the underlying insurance had been exhausted.  Pfizer did not provide the information.

113.    The Insurers have been damaged by Pfizer's failure to provide the information that they reasonably requested.  Such damages include, among other things, the expense of

repeatedly requesting the information at issue and meeting with Pfizer and its counsel to attempt to resolve the claim only to have Pfizer refuse to provide the information that the Insurers need to reasonably assess their obligations under the Policies.

114.   The Insurers are entitled to damages in an amount to be proven at trial as a result of Pfizer's breach of its cooperation obligations.

**WHEREFORE**, the Insurers respectfully request that this Court:

A.   Declare that there is no coverage under the Policies because the Jones Action is not a Claim first made during the Policy Period of the Policies;

B.   Declare that there is no coverage under the Policies because the Prior Notice Exclusion bars coverage for the Jones Action;

C.   Declare that there is no coverage under the Policies because the Morabito Specific Litigation Exclusion bars coverage for the Jones Action;

D.   Declare that there is no coverage under the Policies because the Garber Specific Litigation Exclusion bars coverage for the Jones Action;

E.   Declare that there is no coverage under the North River and RSUI Policies because the Prior and Pending Exclusions bar coverage for the Jones Action;

F.   Declare that there is no coverage under the North River Policy because not all underlying insurance has been fully exhausted by actual payment of covered loss by underlying insurers;

G.   Enter judgment for the Insurers and award the Insurers compensatory damages resulting from Pfizer's breach of its contractual cooperation obligations; and

H.   Award the Insurers their litigation costs and all other relief to which they may be entitled.

### Jury Demand

The Insurers demand a jury trial on all matters so triable.

### Reservation

Other terms, conditions and limitations of the Policies may operate to bar or limit coverage for some or all of the amounts for which Pfizer seeks reimbursement.  The Insurers

reserve the right to raise affirmatively other terms, conditions and limitations as defenses to

coverage as appropriate, including the right to amend this Complaint.


January 31, 2018                              Respectfully submitted,


                                             /s/     S. Dwight Stephens
Of counsel:                                  S. Dwight Stephens (SS 2161)
Cara Tseng Duffield                          Michael F. Panayotou (MP 7744)
Wiley Rein LLP                               Melito & Adolfsen P.C.
1776 K Street NW                             233 Broadway
Washington, DC 20006                         New York, NY 10279
(202) 719-7407                               (212) 238-8900
cduffield@wileyrein.com                      sds@melitoadolfsen.com
                                             mfp@melitoadolfsen.com

                                             *Counsel for Federal Insurance Company*


Of counsel:                                  /s/     Copernicus T. Gaza
Darius N. Kandawalla                         Copernicus T. Gaza
Bailey Cavalieri                             Traub Lieberman Straus & Shrewsberry LLP
10 W. Broad Street Ste. 2100                 Seven Skyline Drive
Columbus, OH 43215                           Hawthorne, NY 10532
(614) 229-3255                               (914) 586-7022
dkandawalla@baileycav.com                    cgaza@tlsslaw.com

                                             *Counsel for RSUI Indemnity Company*


                                             /s/     Copernicus T. Gaza
                                             Copernicus T. Gaza
                                             Traub Lieberman Straus & Shrewsberry LLP
                                             Seven Skyline Drive
                                             Hawthorne, NY 10532
                                             (914) 586-7022
                                             cgaza@tlsslaw.com

                                             *Counsel for North River Insurance Company*